**IN THE UNITED STATES DISTRICT COURT FOR**
**THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ROBERT URBAN, et al., | : | CIVIL ACTION |
| | : | |
| | : | |
| v. | : | NO.  20-3490 |
| | : | |
| ALLSTATE FIRE AND CASUALTY | : | |
| INSURANCE COMPANY | : | |

**<u>MEMORANDUM OPINION</u>**

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE                                October 13, 2021

      Presently before the Court is Defendant's Allstate Fire and Casualty Insurance Company Motion for Summary Judgment as to Coverage. (Doc. 18.) Plaintiffs Robert Urban and Linda Urban brought this action against Allstate alleging breach of contract and loss of consortium for failure to provide coverage under their automobile insurance policy, which includes underinsured motorist benefits. Plaintiffs filed a Response in Opposition to Defendant's Motion (Doc. 19-1), to which Defendants filed a reply. (Doc. 20.)

## I.   INTRODUCTION

After Robert Urban ("Plaintiff" or "Urban") was injured in an accident involving a motor vehicle, his automobile insurer Allstate Fire and Casualty Insurance Company ("Defendant" or "Allstate") declined to pay him underinsured motorist ("UIM") benefits under his policy. Urban and his wife, Linda Urban, filed suit against Allstate for breach of contract and loss of consortium, respectively. Allstate now seeks summary judgment as to coverage. For the following reasons, summary judgment is granted in part and denied in part.

## II.   BACKGROUND

This case arises from a vehicle accident that set into motion a disastrous event resulting in severe electrical injury to Plaintiff, who at the time was acting as a lineman for Verizon. On May 25, 2017, Bryan Weisser ("Weisser"), an underinsured motorist, was the driver of an automobile that struck a utility pole ("Pole X") on Kutztown Road in Montgomery County, Pennsylvania. (Doc. 18, *Def. Statement of Undisputed Facts* at ¶ 6); (Doc. 19-7.)[1]



---

[1] To visualize the specific location of the poles involved in Weisser's accident and Urban's subsequent injury, we include an image of the accident site, attached to both Plaintiff and Defendant's briefs as Exhibit D. *See* (Doc. 19-7); (Doc. 18-1, Def. Ex. D). The image is a Google Earth photograph used during Urban's deposition, which marks the location of Poles A and B as well as the former location of Pole X, which is obscured slightly by a black mark on the pole to the right of the letter "A."

As a result of the accident, Pole X snapped at the point of impact, in line with the height of Weisser's vehicle's hood. (Doc. 19-6, Urban Dep. 26:19-24); (Doc. 19-5, Police Crash Rep. 5/25/17.)[2] Pole X was a "corner pole," also known as a "dead end pole," meaning that there were two (2) sets of cables attached to that pole. (Doc. 18-1, Def. Ex. C, Urban Dep. 24:22-25:6.) The first set of cables ran parallel to Kutztown Road, and the second set of cables ran across, or perpendicular to, Kutztown Road—albeit at an angle, as reflected in the photo above. (*Id*. at 25:15-18); (Doc. 19-7.) These cables were hung in a "slack span" and connected to another pole ("Pole B") on the opposite side of the street. (Doc. 18-1, Def. Ex. C, Urban Dep. 24:12-17); (Doc. 19-7.) Urban explained in his deposition that cables hang in a "slack span" if there is not enough room to put another pole between them, which is the case when cables run across a street. (Doc. 18-1, Def. Ex. C, Urban Dep. 25:7-14.) The result is that "[t]here is no tension on the cable going across the street…[it is] put up there loosely[.]" (*Id*.)

Verizon owned Pole X and was therefore responsible for repairing and replacing the damaged property. (Doc. 18, *Def. Statement of Undisputed Facts* at ¶ 13.) Urban was employed by Verizon at the time of Weisser's accident and had at least 24 years of experience doing "line work." (Doc. 18-1, Def. Ex. C, Urban Dep. 20:5-7.) He was called into work around midnight on the day of Weisser's accident to replace Pole X and transfer the Verizon cables to a new pole. (Doc. 18, *Def. Statement of Undisputed Facts* at ¶ 15.) He arrived on the scene within an hour to see that Weisser's vehicle was still onsite. (Doc. 19 at ¶ 15.) PPL Electric Utilities ("PPL") was

---

[2] Plaintiff contends that the police report from Weisser's accident constitutes inadmissible hearsay and is therefore inappropriate for our consideration on summary judgment. That said, Plaintiff concedes that "the facts and the manner of the [*sic*] incident are not in dispute and Plaintiff does not object to the introduction of the police report into evidence in this matter with regard to the facts surrounding the occurrence of the accident only." (Doc. 19 at 2, n.1.)

already present at the crash location when Urban responded to the accident in the early morning hours of May 26, 2017. (Doc. 18, *Def. Statement of Undisputed Facts* at ¶ 17.) PPL had to shut off the power so that Urban and his team could safely replace Pole X. (*Id*. at ¶ 19.) While PPL was shutting off the power and Urban waited for his team to arrive, he inspected the surrounding area, including the other poles near Pole X. (*Id*. at ¶ 20.) Urban did not see any visible damage to the other poles that suggested they needed to be repaired or replaced. (Doc. 18-1, Def. Ex. C, Urban Dep. 28:6-15.) Pole X was still standing, but "visibly broken" and "leaning." (Doc. 18-1, Def. Ex. C, Urban Dep. 26:19-27:10). The road was closed because the cables running across the street between Pole X and Pole B were "hanging very low," and "drooping." (*Id*. 23:10-12; 27:1-4.).

After PPL shut off the power, Urban and his team replaced Pole X with a new pole ("Pole A"). (Doc. 18, *Def. Statement of Undisputed Facts* at ¶ 21); (Doc. 19-7.) They dug the broken piece of Pole X out of the ground and then set Pole A in the existing hole in the same spot. (Doc. 18, *Def. Statement of Undisputed Facts* at ¶ 21.) The remaining, dangling piece of Pole X was strapped to Pole A so that the cables could be transferred. (*Id*. at ¶ 23.) There were several cables attached to Pole X that needed to be transferred to Pole A. The cable that was highest on Pole X was a 7,000-volt primary power cable. (*Id*. at ¶ 18.) Several feet below the primary power cable was a neutral cable for the electric; 36 inches below the neutral cable was the television cable; 36 inches below the television cable were Verizon's cables. (*Id*.) Therefore, Verizon's two cables—a fiber optic cable and a copper cable—were in the fourth and lowest position on Pole X. (*Id*.) PPL moved its power cables from the remaining piece of Pole X onto Pole A without incident. (*Id*. at ¶ 24.) After PPL's cables were in place, PPL turned the power back on. (*Id*. at ¶ 25). Turning the power back on before all the cables are transferred to the new pole is standard practice; the process

is done this way so that customers who are out of service get their power back on as soon as possible. (*Id*.)

Before Urban and his team from Verizon began to work on transferring the television cable and the other two Verizon cables, they tested the ground wires to ensure they were not energized and confirmed that the power cables were properly grounded. (*Id*. at ¶ 26.) Urban and his crew began the process of a "pole transfer," which is a common job that Urban has done many times. (*Id*. at ¶ 28.) During the pole transfer, Urban went up in a bucket raised from a truck and one of his coworkers went up in a second bucket. (*Id*. at ¶ 29.) Urban and his coworker drilled holes into Pole A and then attached the hardware, called "bales," which hold the cables in place on the pole. (*Id*. at ¶ 30.) Then, they reattached to Pole A the set of cables that ran parallel to Kutztown Road. (*Id*. at ¶ 31.) The final step was to reattach to Pole A the cables that were connected to Pole B, which ran in a "slack span" across Kutztown Road. (*Id*. at ¶ 32.) When Urban was reattaching the "slack span" cables, Pole B snapped and fell over. (*Id*. at ¶ 33.) At the time Pole B snapped, Urban was holding onto the Verizon copper cable with both hands because he was in the process of reattaching it to the bales on Pole A. (*Id*. at ¶ 36.) Somehow during the fall, the live primary power cable came into contact with the copper cable. (*Id*.) The copper cable became energized and Urban felt a blast of electric go through his arms and into his chest. (*Id*. at ¶ 37.) Upon coming down from the bucket, Urban discovered that the power had burned a hole in his leg and his hands were glowing red. (*Id*.)

Urban survived the incident but has required ongoing treatment as a result of the electrical injury he suffered.[3] (*Id*. at ¶ 38.) After the accident, Urban's employer Verizon investigated Pole

---

[3] The parties agree that the nature and extent of Urban's injuries are not the subject of Defendant's motion for summary judgment. In their Rule 26(f) Report, the parties decided that the question of coverage would be bifurcated from the question of damages, and "[i]f it is determined that Urban

B's collapse and produced a post-accident report. (*Id*. at ¶ 45). According to the investigator Brian Greenday ("Greenday"), Pole B "unexpectedly snapped created an electrical contact issue." (*Id*. at ¶ 50.) Greenday stated that "there was no evidence of what actually did it so I deferred to [ ] saying…there was nothing that caused it." (*Id*. at ¶ 51.) This investigation was the only formal inquiry into the accident; no other investigation was undertaken to determine what may have caused Pole B to snap. (*Id*. at ¶ 53.)  In addition to the Verizon report, Allstate also provided a report produced by Osmose Utilities Services, Inc., ("Osmose") the company that was required to maintain Pole B. (Doc. 18-1, Def. Ex J.) The Osmose report stated that Pole B had woodpecker holes, a "0.32 rot depth," and signs of early stage decay but did not offer a conclusion as to whether these physical conditions were so extensive that they alone could have caused Pole B to snap. (*Id*.) Alternatively, Urban claims that Pole B snapped under the weight of the slack-span cables that were running across Kutztown Road. That is, the heaviness of the drooping lines, which were "hanging very low" after Weisser's vehicle hit Pole X, caused Pole B to snap while attaching the cables from Pole B to Pole A. (Doc. 18-1, Def. Ex. C, Urban Dep. 13:24-14:4; 23:12; 27:1-4.) Thus, there are three different accounts as to the possible cause—or in Greenday's view, the lack thereof—of Pole B's collapse.[4]

---

is not entitled to UIM coverage, the case will be concluded." (Doc. 18, *Def. Statement of Undisputed Facts* ¶ 58.)

[4] We note that Urban and Greenday have not been proffered as expert witnesses, nor has this Court formally subjected their testimony to the appropriate scrutiny required by *Daubert v. Merrell Dow Pharm*., 509 U.S. 579 (1993). Accordingly, for purposes of resolving this motion, we have assessed and accepted their deposition testimony pursuant to Federal Rule of Evidence 701, which states that: "If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. To that end, we believe Urban and Greenday can appropriately attest to the events related to Urban's injury that they perceived, as well as any of the following: "[the] appearance of persons or things, identity,

The parties have agreed that Allstate had issued to Urban an automobile insurance policy, Policy No. 952 161 999 (the "Policy"). *See* (Doc. 18-1, Ex. A.) It was in effect on the date of the accident. (*Id*.) The Policy, provided underinsured motorist ("UIM") benefits coverage in the amount of $100,000.00 per person and $300,000.00 per accident. (*Id*.) The relevant language outlining the requirements for receiving UIM benefits is as follows:

> [Allstate] will pay damages to an insured person for bodily injury which an insured person is *legally entitled to recover* from the owner or operator of an underinsured auto. Bodily injury must be caused by accident and *arise out of the ownership, maintenance or use of an underinsured auto*. [ ] An underinsured auto is: A motor vehicle which has bodily injury liability protection in effect at the time of the accident, but its limit for bodily injury liability is less than the damages the insured person is legally entitled to recover.

(*Id*.) (emphasis added). Allstate contends that it is not required to tender UIM benefits to Urban because he is not "legally entitled to recover" any damages from Weisser, and because his bodily injury did not "arise out of the ownership, maintenance or use of an underinsured auto."

In addition to the dispute over coverage, there is a dispute as to the recoverable amount of UIM benefits. There are three (3) vehicles listed in the Policy under the general "Vehicles covered" section: a 2011 Ford Truck F-350, a 2013 Ford Taurus, and a 2016 Forest River camper. (*Id*.) Allstate does not dispute that in the event Urban is owed UIM benefits, his coverage limit is stacked for two (2) vehicles—the 2011 Ford Truck F-350 and the 2013 Ford Taurus—making the coverage limit $200,000.00 per person and $400,000.00 per accident. Urban contests, however, that his coverage limit should be stacked for three (3) vehicles to include his 2016 Forest River camper.

---

the manner of conduct, competency of a person, degrees of light or darkness, sound, size, weight, distance, and an endless number of items that cannot be described factually in words apart from inferences." Fed.R.Evid. 701, Advisory Committee Notes for the 2000 Amendments (citing *Asplundh Mfg. Div. v. Benton Harbor Eng′g*, 57 F.3d 1190, 1196 (3d Cir. 1995)).

After the accident, on June 16, 2020, Plaintiff filed this suit against Allstate seeking UIM benefits in the Montgomery County Court of Common Pleas.[5] (Doc. 18, *Def. Statement of Undisputed Facts* at ¶ 57.) Allstate timely removed the case to the United States District Court for the Eastern District of Pennsylvania. (Doc. 1.) On July 28, 2021, Allstate filed this motion for summary judgment, asserting the above-stated arguments and seeking dismissal of Urban's case on the basis that Urban is not entitled to UIM coverage under the Policy.

## III.  LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). In evaluating a summary judgment motion, the court must "view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment." *Scott v. Harris*, 550 U.S. 372, 378 (2007) (internal quotations and alterations omitted). "A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of [its] burden of proof." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citations omitted). However, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010). "The non-moving party has the burden of producing evidence to establish prima facie each element of its claim." *Schaar v. Lehigh Valley Health Servs., Inc.*, 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010) (citing *Celotex*

---

[5] After the accident, Urban first filed a personal injury action against Weisser, PPL, and Osmose in the Philadelphia Court of Common Pleas. (Doc. 18, *Def. Statement of Undisputed Facts* at ¶ 54.) That case was settled on June 15, 2020, prior to any determination of liability. (*Id*. at ¶ 56.) Further, according to a report by the Bureau of Worker's Compensation, Urban settled his personal injury case out of court for a total of $104,250.00. (*Id*. at ¶ 55.)

*Corp. v. Catrett*, 477 U.S. 317, 319 (1986)). In turn, "the moving party need only show that the non-moving party 'has failed to produce evidence sufficient to establish the existence of an element essential to its case' in order to obtain summary judgment." *A. Natterman & Cie GmbH v. Bayer Corp.*, 428 F. Supp. 2d 253, 257 (E.D. Pa. 2006) (quoting *Alvord–Polk, Inc. v. Schumacher & Co.*, 37 F.3d 996, 1000 (3d Cir. 1994)).

## IV.   DISCUSSION

Given the record discussed above, Urban asserts that Allstate is contractually obligated under his Policy to tender his UIM benefits and do so at the stacked coverage rate of three (3) vehicles, for a total of $300,000.00. As an initial matter, Allstate contends that UIM coverage is not available to Urban because there is no evidence his injuries were a proximate cause of Weisser's negligence. Allstate then argues that it is entitled to summary judgment for a "separate and independent" reason, as Urban cannot demonstrate his injuries "arose out of the ownership, maintenance or use of an underinsured auto," as required by the Policy and the Pennsylvania Motor Vehicle Financial Responsibility Law ("MVFRL"). Further, Allstate claims that even if Urban is entitled to UIM benefits under the Policy, Urban cannot "stack" his non-motorized travel trailer to recover additional payment within a higher coverage limit.

We first discuss the claims related to the MVFRL's "arose out of" actual cause standard and Pennsylvania's common law proximate cause standard. Next, we review Urban's stacking claims. The parties agree that Pennsylvania law governs our interpretation of Urban's Policy and thus the extent to which it provides coverage, therefore, we apply Pennsylvania law in our analysis.

### A.   Causation

In its briefing, Allstate asserts that this case involves "a pure question of causation." (Doc. 18 at 5.)  That is, for Urban to be entitled to UIM coverage, he has the burden of proving that

Weisser's vehicle hitting the utility pole was the actual and proximate cause of his electrical injury. In support of its argument as to proximate cause, Urban claims that Weisser subjected him to a foreseeable risk of harm and is thus responsible for all consequences "which follow in a natural sequence of events." (Doc. 19-1 at 7.) As to actual cause, Urban claims the incident "arose out of" Weisser's accident, even though the object that directly caused his injury was not a motor vehicle. (*Id*. at 8.) In response, Allstate contends that as a matter of law Urban's allegations cannot support a finding of causation that would trigger coverage under the Policy.

The purpose of UIM coverage is to protect the insured from the risk that a negligent driver of another vehicle will cause injury to the insured and the negligent driver will have inadequate liability coverage to compensate the insured for the injuries caused by his negligence. *See Nationwide Ins. v. Resseguie*, 980 F.2d 226, 231 (3d Cir. 1992). Both the MVFRL and the Policy reflect this principle, providing UIM coverage for damages an insured is "legally entitled to recover" from "owners or operators of underinsured motor vehicles." 75 PA. C.S. § 1731(c) (1995); *see also* (Doc. 19-4 at 38). ("[W]e will pay damages to an insured person for bodily injury which an insured person is legally entitled to recover from the owner or operator of an underinsured auto."). Interpreting the same Allstate UIM policy language as in this case, the Third Circuit stated that if the insured has no right to recover damages from the tortfeasor, the insurance company "has no responsibility to pay under its policy." *Willet v. Allstate Ins.*, 359 F. App'x 349, 351 (3d Cir. 2009). UIM coverage thus creates a form of derivative liability, "binding the UIM insurer to the liability of the tortfeasor." *Renner v. Progressive N. Ins.*, No. 2:12-CV-2570-CDJ, 2014 WL 1091359, at *3 (E.D. Pa. Mar. 18, 2014) (citing *Willet*, 359 F. App'x at 351).

Accordingly, Urban can recover from Allstate what he could have recovered from Weisser, but Allstate has no contractual obligation to provide UIM benefits unless Urban can prove that

10

Weisser's negligence caused his injuries. Under Pennsylvania law, a negligence claim requires proof of four (4) elements: (1) a duty to a foreseeable plaintiff; (2) a breach of that duty; (3) a causal relationship between the tortfeasor's breach and the plaintiff's injuries; and (4) actual loss or damages.[6] *See Galullo v. Fed. Express Corp.*, 937 F. Supp. 392, 394 (E.D. Pa. 1996) (citing W. Prosser, LAW OF TORTS § 30, at 143 (4th ed. 1971)). In Pennsylvania, "causation involves both cause in fact (or physical cause) and proximate (or legal) cause." *Id*. The question of actual cause is "a *de minimis* standard of causation under which even the most remote and insignificant force may be considered the cause of an occurrence." *Id*. at 395 (citing *Herman v. Welland Chem., Ltd*., 580 F. Supp. 823, 827 (M.D. Pa. 1984). "Proximate cause, on the other hand, assumes the presence of cause in fact and serves as a means by which courts are able to place practical limits on liability as a matter of policy." *Id*. (citing *Wisniewski v. Great Atl. & Pac. Tea Co.*, 323 A.2d 744, 748 (Pa. Super. 1974). Below, we set out a discussion of actual cause under the MVFRL and proximate cause under Pennsylvania common law, applying those standards to Urban's underlying claim regarding Weisser's negligence.

### i.  MVFRL "Arose Out Of" Causation

In this case, the question of actual cause is governed by Urban's Policy, which states in relevant part: "Bodily injury must be caused by accident and *arise out of the ownership, maintenance or use* of an underinsured auto." (Doc. 19-4 at 38) (emphasis added). This language is consistent with the standard established in the MVFRL:

> (c)  Underinsured motorist coverage.--Underinsured motorist coverage shall provide protection for persons who suffer injury

---

[6] Though Urban discusses the first element of negligence (duty) at length in his response briefing (*see* Doc. 19-1, at 5-6), we note that the only element challenged by Allstate on summary judgment is the third element of negligence (causation). As there is no dispute regarding any element aside from causation, we accept all other elements as established for purposes of resolving Allstate's motion.

> *arising out of the maintenance or use of a motor vehicle* and are
> legally entitled to recover damages therefor from owners or
> operators of underinsured motor vehicles…[.]

75 Pa. C.S. § 1731(c) (emphasis added). In construing this language, the Pennsylvania Supreme

Court has held that, in the context of insurance policies, "arising out of" means "causally connected

with, not proximately caused by." *Allstate Prop. & Cas. Ins. v. Squires*, 667 F.3d 388, 391 (3d Cir.

2012) (quoting *Mfrs. Cas. Ins. v. Goodville Mut. Cas. Co*., 170 A.2d 571, 573 (Pa. 1961)).

Accordingly, an insured seeking coverage under the phrase "arise out of" need only adequately

allege that the underinsured motorist's vehicle was an actual cause of his injuries. *See id*. at 392.

More specifically, the inquiry is whether an insured would not have been injured "but for" the

maintenance, ownership, or use of the underinsured motorist's vehicle. *See Mfrs. Cas. Ins*., 170

A.2d at 573. As applied to this case, the question is whether but for Weisser's motor vehicle

accident, Urban would not have been harmed.

Historically, Pennsylvania courts have focused on the "instrumentality" of the injury,

noting that if an injury is caused by "an external force other than the motor vehicle itself, the

vehicle will be not regarded as having contributed to the cause of the injuries pursuant to the

'arising out of' language." *Squires*, 667 F.3d at 392 (citing *Lucas-Raso v. Am. Mfrs. Ins*., 657 A.2d

1, 3 (Pa. Super. 1995)). The Third Circuit, however, clarified that when assessing whether an

incident arose out of "the maintenance, ownership, or use of a motor vehicle," such an inquiry "is

informed by—but does not necessarily turn on—the 'instrumentality' that directly [caused] the

accident." *Id*. at 395. The insured does not have to demonstrate "physical contact with an

[underinsured] vehicle" for an accident to "arise out of" the use of an underinsured vehicle, and

"depending on the facts of the case, some less direct causal relationship sometimes will suffice."

*Id*. at 396. In sum, "the object that directly caused an accident surely is relevant in a causation

analysis, [but] it is not dispositive and does not foreclose the possibility that the accident arose out of the use of a motor vehicle." *Id*. at 395. Even in the face of this precedent, Allstate cites *Lucas-Raso v. Am. Mfrs. Ins.,* 657 A.3d 1 (Pa. Super. 1995) in support of its argument that evidence of an "external force other than the motor vehicle itself will defeat a claim that the vehicle contributed to the cause of the injuries." (Doc. 18 at 20) (quoting *Lucas-Raso*, 657 A.2d at 3-4).

In *Lucas-Raso*, a workers' compensation subrogation action, an employee was injured after she slipped in a snow-covered pothole as she was approaching her car. *Id*. at 4. The Pennsylvania Superior Court held that her injuries did not "arise from" the maintenance or use of a motor vehicle because she failed "to establish the necessary nexus between her injury and the use of the…vehicle." *Id*. at 5. The court further explained that she failed to offer any "connection to link her fall to the use of her vehicle other than her claim that she was en route to enter it…it was not the act of entering her vehicle which caused the fall[.]" *Id*. Ultimately, the court concluded that even if an accident is "vehicle-oriented," it does not mean it triggers coverage under the policy. *Id*.; *see also Squires*, 667 F.3d at 395 (explaining that even if a vehicle was the "situs" of an injury, its presence is not automatically "instrumental" to that injury). This holding was, in the view of the Superior Court, consistent with the Pennsylvania legislature's purpose in passing the MVFRL to "compensate losses directly resulting from motoring accidents and to leave injuries tangential to driving to other systems of compensation." *Id*. at 3.

In *Squires*, Third Circuit distinguished *Lucas-Raso* and similar Pennsylvania Superior Court cases by explaining the difference between an accident that is "a direct consequence" of a vehicle and an accident that has only "incidental involvement" with a vehicle.[7] *Squires*, 667 F.3d

---

[7] Specifically, the Third Circuit distinguished these cases as being factually different from *Squires*: *Smith v. United Servs. Auto. Ass'n*, 572 A.2d 785 (Pa. Super. 1990) (holding that the intentional intervening act of a third party, a person throwing hay from the back of a vehicle, severed the "but-

at 393. The plaintiff in *Squires* was injured after swerving his truck to avoid a cardboard box in

the middle of his lane on the highway. *Id*. at 389. Both the plaintiff and the defendant, Allstate,

were uncertain as to how the box came to be left on the road, but for purposes of its motion for

judgment on the pleadings, Allstate stipulated that an unidentified vehicle must have dropped the

box. *Id*. The plaintiff sought uninsured motorist benefits under his policy, but Allstate refused to

provide coverage, claiming his injuries were caused by the box in the middle of the road—not the

unidentified vehicle who had dropped the box.[8] *Id*. It was against this factual backdrop that the

Third Circuit concluded physical contact with a vehicle is not required for an accident to "arise

out of" the vehicle's use. *Id*. at 396. Simply put, "when the unidentified vehicle dropped the

---

for" causal connection); *Roach v. Port Auth. of Allegheny Cty.*, 550 A.2d 1346, 1350 (Pa. Super. 1988) (holding that a bus passenger who was injured as a result of a fight between two other passengers did not "establish the requisite causal connection between the 'maintenance and use of a motor vehicle' and the injuries"); *Alvarino v. Allstate Ins.*, 537 A.2d 18, 21 (Pa. Super. 1988) (holding that a passenger who was bitten by a dog chained inside a van did not suffer injuries arising out of the maintenance or use of a motor vehicle, because the motor vehicle was merely "the place where injuries [were] sustained"); *Camacho v. Nationwide Ins.*, 460 A.2d 353, 354 (Pa. Super. 1983) (holding that injuries sustained by driver sitting in car caused by an explosive device that was thrown from another vehicle did not arise out of the use of the other vehicle); *Schweitzer v. Aetna Life and Cas. Co.*, 452 A.2d 735, 738-39 (Pa. Super. 1982) (denying coverage for a claimant who was pulled from her vehicle and assaulted, because neither she nor her assailant was "acting in the role of motorist," and "an assault by an armed assailant upon the driver of a car [is not] the type of conduct that is reasonably identifiable with the use of a car"). *See Squires*, 667 F.3d at 393-94. Conversely, the Third Circuit cited to a Pennsylvania Superior Court case, *Lehrer/McGovern v. Workers' Comp. Appeal Bd.*, 720 A.2d 853 (Pa. Commw. Ct. 1998), to explain that a confluence of an external object and a vehicle *can* cause an accident eligible for UIM benefits.

[8] Notably, *Squires* involved a coverage dispute involving *uninsured* motorist benefits, rather than *underinsured* motorist benefits. The language used in Allstate's policy regarding uninsured motorist benefits is: "Bodily injury must be caused by accident and *arise out of* the ownership, maintenance, or use of an uninsured auto." *See id*. at 389 (emphasis added). This policy language is identical to that in the UIM benefits provision, and *Squires* has been applied accordingly in cases involving underinsured motorist coverage. *See, e.g. Knightbrook Ins. Co. v. Northfield Ins. Co.*, 158 F. Supp. 3d 336, 343 (E.D. Pa. 2016).

cardboard box, it had more than an incidental involvement in the situation that gave rise to [the plaintiff's] injuries." *Id*. at 393 (internal citations omitted).

Although we understand Allstate's argument in citing *Lucas-Raso* for the proposition that tangential injuries caused by an underinsured vehicle should not be covered under UIM benefits, we do not believe Urban's injury so tangential as to deny him coverage as a matter of law. Here, we find that a reasonable jury could conclude that Urban's injury "arose out of" Weisser's "use" of his vehicle. We have carefully considered Third Circuit precedent in reaching this determination, and upon our review of the record, we find the facts of this case akin to those in *Squires*. "But for" the box in the road, the plaintiff in *Squires* would not have swerved his vehicle; similarly, "but for" Weisser's accident necessitating the repair of Pole X, Urban would not have had to reattach the cable that connected Pole X to Pole B. There is no dispute that Pole B was the instrumentality that directly caused Urban's injury (Doc. 19 at ¶ 9), but that fact does not foreclose the possibility that the accident "arose out of" the use of a motor vehicle. Instead, we must evaluate whether the facts could support a finding that Urban was injured, to use Plaintiff's words, "*by and because of*" Weisser's vehicle striking Pole X. (*Id*.) In that regard, we believe that Urban has presented sufficient evidence for a jury to conclude that Weisser's striking of Pole X was a "but-for" cause of his electrical injury.

Without a doubt, the facts in this case reflect the "less direct causal relationship" that the Third Circuit referenced in *Squires*. Allstate maintains that Pole B "unexpectedly snapped," and that there is no evidence of a nexus between Weisser's vehicle hitting Pole X and Urban's suffered harm. Urban has, however, demonstrated that Weisser's vehicle and Pole X had "more than an incidental involvement" in the circumstances that caused his injuries. Namely, but for Weisser's accident with Pole X, Urban would not have had to repair the cables connected to Pole B—as

Urban stated, "an accident involving a utility pole may very well necessitate repair work." (*Id*. at ¶ 7.) Although Pole B was not the pole struck by Weisser's vehicle, Urban testified that Pole X and Pole B were tethered together by cables running above and across the road below. (Doc. 19-6, Urban Dep. 39:1-40:1.) When he was replacing the damaged Pole X with Pole A, Pole B cracked "[i]n the process of attaching the cables that were across the street." (Doc. 19-6, Urban Dep. 13:24-14:4.) Importantly, Pole X and Pole B were not two separate, stand-alone objects; they were linked by apparently drooping, weighty cables. (Doc. 19-7.); (Doc. 19-6, Urban Dep. 27:1-4; 42:14-15.) It follows logically that if the poles were connected by shared cables, and the cables from Pole B needed to be reattached to Pole X in the event Pole X were damaged, then the stability of Pole B was necessarily dependent on Pole X, and vice-versa.[9]

Allstate's rejoinder is that Pole B snapped not because of Weisser's accident, but because it was poorly maintained, citing woodpecker holes, "rot depth," and early stage decay as damage that could have caused its fall. (Doc. 18 at 21.); (Doc. 18-1, Def. Ex. J.) The Third Circuit, however, has held that in the context of "but-for" causation, there may be two or *even more* causes of an injury. *Squires*, 667 F.3d at 395 (citing *Lehrer/McGovern v. Workers' Comp. Appeal Bd.*, 720 A.2d 853, 854 (Pa. Commw. Ct. 1998)) (emphasis added). In *Lehrer/McGovern*, "a construction worker was injured when a metal container slid off of a nearby flatbed truck and traveled about ten feet before hitting a large steel box that struck the worker." *Id*. (internal citations omitted). Applying this precedent, the Eastern District of Pennsylvania explained that a separate incident that contributed to an injury does not necessarily interrupt the "but-for" causal chain required for

---

[9] In fact, Greenday, the investigator who prepared Verizon's post-accident report, testified that when Pole X was struck by Weisser's vehicle, there was likely some force exerted on Pole B by reason of the fact that there were lines connecting the poles. (Doc. 18-1, Def. Ex. E, Greenday Dep. 80:18-81:3.)

coverage. *See Knightbrook Ins. Co. v. Northfield Ins. Co.*, 158 F. Supp. 3d 336, 343 (E.D. Pa. 2016) (finding a healthcare worker's negligence in failing to properly use a vehicle's wheelchair lift did not sever the causal connection between the "use" of the vehicle and the insured's injuries). That is, the negligent failure to properly maintain Pole B does not necessarily mean that Urban's injuries did not arise out of Weisser's vehicle striking Pole X, which may have further compromised Pole B's structural integrity. In sum, Urban suffered harm because an underinsured motorist struck Pole X, which was connected to Pole B, causing the electrical injury to Urban. Under these facts, a jury could well determine that the negligent driving of Weisser's vehicle constitutes a "but-for cause" of Urban's injuries and that the Policy should be triggered.

Lastly, we note that "the MVFRL is to be liberally construed in order to afford the greatest possible coverage to injured claimants and in close or doubtful insurance cases, a court should resolve the meaning of insurance policy provisions or legislative intent in favor of coverage for the insured." *Squires*, 667 F.3d at 396 (internal citations omitted) (internal quotation marks omitted). In our insured-friendly reading of the relevant policy language, viewing the facts in the light most favorable to Urban, we conclude that a reasonable jury could find Weisser's "ownership, maintenance or use" of an underinsured vehicle was a "but-for" cause of Urban's injury. For these reasons, summary judgment is denied as to this issue.

### ii.  Proximate Causation

Having decided that Urban has presented facts to establish actual cause, we turn now to the question of proximate cause. *See Gallulo*, 937 F. Supp. at 395 (explaining that proximate cause assumes the presence of actual cause). In determining whether a defendant's negligence is the proximate cause of an injury, Pennsylvania has adopted the "substantial factor" test, which turns on whether "the alleged wrongful acts were a substantial factor in bringing about the plaintiff's

harm." *Id*. (citing *E.J. Stewart, Inc. v. Aitken Prods., Inc.,* 607 F. Supp. 883, 889 (E.D. Pa. 1985), *aff'd*, 779 F.2d 42 (3d Cir. 1986)). The Pennsylvania Supreme Court set forth three factors to consider in a "substantial factor" analysis:

> (a) the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it;
> (b) whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible;
> (c) lapse of time.

*Vattimo v. Lower Bucks Hosp., Inc*., 465 A.2d 1231, 1234 (Pa. 1983) (citing RESTATEMENT OF TORTS, SECOND § 433 (1965)). The underlying inquiry in the "substantial factor" test is "whether the defendant's conduct, although a cause in the 'but for' sense, is so insignificant that no ordinary mind would think of it as a cause for which a defendant should be held responsible." *Ramara, Inc. v. Westfield Ins.*, 298 F.R.D. 219, 224 (E.D. Pa. 2014) (quoting *Ford v. Jeffries*, 379 A.2d 111, 114 (Pa. 1977)).

Allstate has stated repeatedly that Urban has failed to present evidence beyond guesswork as to what caused Pole B to snap. Therefore, in order to find proximate cause, "a jury would have to speculate that somehow Mr. Weisser hitting Pole X caused Pole B, which was across the street…to snap and fall[.]" (Doc. 18 at 21.) Allstate cites *Galullo v. Fed. Express Corp*., 937 F. Supp. 392 (E.D. Pa. 1996) in support of its contention that a cause cannot be considered a "substantial factor" of an injury if it is one of multiple probable, but unproven, causes of that injury. In *Galullo*, the plaintiff brought a negligence action against FedEx, claiming she was injured when she slipped and fell on a letterpack allegedly left on her garage floor. *Id*. at 394. The evidence in the record demonstrated that there were several possible reasons why the plaintiff could have

18

slipped: (1) the letterpack, (2) wet leaves, and (3) an old rug. *Id*. at 397-98. The court stated that because were "several equally plausible possibilities as to what caused [the plaintiff's] fall," a jury would have to guess that the letterpack caused the plaintiff's injury. *Id*. at 397. Allstate claims the same kind of speculation would have to occur in this case were it before a jury, as there is no direct evidence to support the cause of Pole B's collapse. There is a difference, however, between conjecture based on pure speculation and reasonable inferences supported by circumstantial facts. Notably, the court in *Galullo* acknowledged that "[a] plaintiff may use circumstantial evidence to prove negligence or proximate cause." *Id*. (citing *Hamil v. Bashline*, 392 A.2d 1280, 1285 (Pa. 1978). The plaintiff's claim in *Galullo* failed because she presented no other circumstantial evidence aside from stating that she slipped on "something wet." *Id*. Although Urban does not present any direct evidence in the form of expert reports or official inspections of Pole B to support his claims, he does present enough circumstantial evidence for a jury to make an appropriate inference of proximate cause.

In reviewing Urban's deposition testimony, we note that despite Urban's statement that he is not sure as to why Pole B snapped, he also consistently explains the cause of the accident as a result of attaching the cables from Pole B to Pole A, for example:

> Q: Do you have understanding of why it was that pole B snapped? What happened?
>
> A: I'm not really sure. We had already attached, the cable TV slacked span across the road and *we were in the process of attaching* Verizon's copper cable, which was the second cable we were attaching. That's when I heard the pole crack and everything started shaking. That's how I got electrocuted[.]

(Doc. 19-6, Urban Dep. 40:11-20) (emphasis added). Later during his deposition, in response to a question about whether hoisting the cable connected to Pole B in order to attach it to Pole A would create tension between the poles, Urban testified that there was no tension on the lines, rather, they

were in a "slack span." (Doc. 19-6, Urban Dep. 42:7-17.) He stated that the collective weight of

the cables was enough to crack Pole B. (*See id*.) We note that although Urban characterized this

claim as "his best guess" as to what caused the accident, we believe his opinion to be an informed

and educated one, having completed numerous pole transfers during his career.[10] These statements

are consistent with Urban's other accounts of the accident, in which he stated that the lines were

"hanging very low" or "drooping" when he arrived on the scene, and that "[i]n the process of

attaching the cables that were across the street, the pole across the street [Pole B] cracked and fell

over and I was holding onto the cable trying to attach it to [Pole A]." (Doc. 18, Def. Ex. C, Urban

Dep. 13:24-14:4; 23:12; 27:1-4.) In sum, after removing the damaged Pole X, Urban points to the

---

[10] The facts in the record demonstrate that Urban had at least 24 years of experience doing "line work." (Doc. 19-6, Urban Dep. 20:5-7.) Urban testified that "a pole transfer" was "a fairly common job," and a job that he had done "many times." (Doc. 19-6, Urban Dep. 20:11-20.) We acknowledge that Plaintiff has not submitted any expert report in support of its contention that Pole B was "weak from a structural integrity standpoint such that the lifting of the Verizon lines, along with the weight of the other lines, caused it to snap." (Doc. 19 at ¶ 58.) We do think, however, that Urban's extensive experience as a lineman permits him to opine as to the weight of the cables and the possibility that they caused Pole B to snap during the reattachment process. In accepting Urban's testimony as to this issue, we note that lay witnesses may sometimes offer opinions on technical matters without qualifying as experts under Rule 702. *See Asplundh Mfg. Div. v. Benton Harbor Eng'g*, 57 F.3d 1190, 1201 (3d Cir. 1995). The Third Circuit has held that "a lay witness with first-hand knowledge *can* offer an opinion akin to expert testimony in most cases, so long as the trial judge determines that the witness possesses sufficient and relevant specialized knowledge or experience to offer the opinion." *Id*. (emphasis in original); *see also Acosta v. Cent. Laundry, Inc.*, 273 F. Supp. 3d 553, 557 (E.D. Pa. 2017) (a lay witness's experience as a wage and hour investigator was sufficient to allow her to testify as to the calculation of damages); *Ries v. CSX Transp., Inc.*, No. CIV.A. 96-3325, 2000 WL 377509, at *3 (E.D. Pa. Mar. 29, 2000) (railroad workers were qualified to opine on the placement of a train derailer and the condition of the railroad ties to which the derailer was attached); *Malloy v. Metalcraft of Mayville, Inc*., No. 96-1581, 1997 WL 269581, at *6 (E.D. Pa. May 14, 1997) (chief engineer of lawnmower company could opine on the design of a lawnmower's safety features). We acknowledge that a *Daubert* motion is not currently before us and that Allstate will be able to formally contest the admissibility of Urban's testimony at trial. For purposes of resolving this motion, however, we think Urban has sufficient knowledge and experience as a lineman to testify as to the weight and reattachment of the cables from Pole A to Pole B.

reattachment of the cables from Pole B to Pole A, and the weight of those cables, as the cause of the accident. Put simply, a moving car exerted force on one pole that was attached to another pole by heavy wires; it does not require any guesswork to conclude that the weight of those wires may have impacted the structural soundness of the poles during the repair process. We believe this is a reasonable inference a jury should be permitted to make.[11]

Allstate claims that Verizon's post-accident investigative report determined that there was "no identifiable cause for Pole B snapping," but we are convinced otherwise. Although the report states that the pole "unexpectedly snapped," it also recommends that "[t]he power company will need to inspect the integrity of the pole at their attachments…[Verizon technicians should] address pole integrity at their attachment levels[.]" (Doc. 18-1, Def. Ex. F.) This report reflects some understanding or acknowledgement that the reattachment of the heavy cables from Pole B to Pole A contributed to the accident. Allstate points to another report produced by Osmose which explains that Pole B had shown early signs of deterioration at the time of its collapse. Like the Verizon report, we believe that the Osmose report is consistent with Urban's testimony that Pole B broke when he was reattaching Pole B's connecting wires to Pole A. Nothing in the Osmose report opines that the decay, on its own, was so extensive to cause Pole B to snap; it merely accounts for the

---

[11] Although we acknowledge Allstate's argument that our holding could result in a "slippery slope of hypothetical situations in which coverage could be extended far beyond automobile accidents," including one in which Allstate claims it would be "required to provide coverage for Mr. Urban being struck by lightning while working at a job site in the aftermath of an auto accident," we believe the principles underlying the proximate cause analysis provide a safeguard against this concern. *See* Doc. 18 at 22. The significant fact guiding our decision in this case is that Pole B and Pole X were attached by shared cables when Pole X was struck by Weisser's vehicle. The proximate cause analysis, however, places "practical limits on liability as a matter of policy" and the mere fact that an accident is "vehicle-oriented" does not mean it will always trigger UIM coverage. *See Galullo*, 937 F. Supp. at 395; *Lucas-Raso*, 657 A.2d at 5. Thus, unless the hypothetical bolt of lightning is tethered to an underinsured motor vehicle, we think Allstate need not be anxious about our decision giving way to a "slippery slope" of coverage disputes.

physical condition of the pole at the time of the accident. The report does note, however, that Pole B "[S]PLIT WHERE HARDWARE CONNECTS TO POLE." (Doc. 18-1, Def. Ex. J.) Thus, there is enough circumstantial evidence in the record to suggest that the post-accident reattachment of the wires between Pole B and Pole A contributed to Pole B's collapse.

Evaluating the accident according to the "substantial factor" test under Pennsylvania law, we find that under prong (a), the record demonstrates that Weisser's vehicle hitting Pole X, which was replaced by Pole A and connected to Pole B, could be considered by the jury to be the primary factor contributing to Urban's injuries. Pole X was connected to Pole B, and Pole B subsequently snapped and caused injury to Urban during repair. Allstate has pointed to the physical condition of Pole B as an additional consideration in the causation analysis, but we believe a jury should be able to consider whether Pole B's fitness substantially contributed to Pole B's collapse, or whether the physical deterioration of the pole, alone, could have caused it to snap. As to prong (b), we find that Weisser's conduct created a series of forces that were continuous and active up to the time of injury, and thus "created a situation" for Urban to be injured. In Urban's words, it is "common sensical" that an accident involving a utility pole would require repair. (Doc. 19-1 at ¶ 7.) By hitting Pole X, Weisser created a situation in which dangerous electrical work needed to be performed on the wires connecting Pole X to Pole B, which ultimately contributed to Pole B's fall. Finally, regarding prong (c), Urban was on the scene of the accident within an hour of the crash; in fact, he testified that Weisser's vehicle was still onsite when he arrived. (Doc. 19-6, Urban Dep. 26:6-10.) The temporal proximity between the accident and Urban's injury gives rise to a reasonable inference of causation. All together, these factors support a determination that Weisser's vehicle hitting Pole X was a "substantial factor" in bringing about Urban's injury by Pole B.

In short, we believe that an "ordinary mind" would think Weisser's vehicle hitting Pole X was such an event that could well be considered a "cause" of Urban's injury. *See Ramara*, 289 F.R.D. at 224. A reasonable jury could thus conclude that Weisser's accident was "a substantial factor" in Urban's electrical injury, and therefore a proximate cause of the harm Urban suffered. For these reasons, summary judgment is denied as to this issue.

### B.      Stacking

Allstate claims that in the event Urban is entitled to UIM benefits under the Policy, his coverage limit should be stacked for two (2)—not three (3)—vehicles. It does not dispute that the Urban's coverage under the Policy is stacked for two (2) vehicles, making the UIM coverage limit $200,000.00 per person and $400,000.00 per accident. In response, Urban argues that his UIM benefits must be stacked for three (3) vehicles to include his non-motorized travel trailer, a 2016 Forest River camper, resulting in a higher coverage limit of $300,000.00 per person and $600,000.00 per accident. Allstate contends, however, that a non-motorized travel trailer does not qualify as a "motor vehicle" under the Policy, and that we should limit Urban's recovery accordingly.

Under the MVFRL, insurance providers are required to make available underinsured motorist coverage "with respect to any *motor vehicle* registered or principally garaged in this Commonwealth[.]" 75 PA. C.S. § 1731(a) (emphasis added). "When a person insures more than one vehicle with UIM coverage, the statutory default is that the policies will stack." *Nat'l Gen. Ins. Co. v. Sheldon*, No. 20-3222, 2021 WL 2946427, at *1 (3d Cir. July 14, 2021) (citing 75 PA. C.S. § 1738(a)). "Stacking" is when the insured person is entitled to coverage equal to the "sum of the limits for each *motor vehicle* as to which the injured person is an insured." 75 PA. C.S. § 1738(a) (emphasis added). In order to determine whether Urban's Policy should be stacked to include his

2016 Forest River camper, we must define "motor vehicle." Both parties acknowledge that the term "motor vehicle" is not defined under the MVFRL. *See* (Doc. 18 at 22; Doc. 19-1 at 10); *see also* 75 PA. C.S. § 1702. The Pennsylvania Vehicle Code, however, defines "motor vehicle" as: "A vehicle which is *self-propelled* except an electric personal assistive mobility device or a vehicle which is propelled solely by human power." 75 PA. C.S. § 102 (2021) (emphasis added). Federal and state courts applying Pennsylvania law have, historically, used the definitions set forth in the Pennsylvania Vehicle Code to interpret vague or undefined terms in the MVFRL.[12] In line with these precedents, we too defer to the Pennsylvania Vehicle Code's definition of "motor vehicle" in determining whether Urban's non-motorized travel trailer qualifies for stacking under the Policy.

In this case, the material facts concerning the nature of Urban's travel trailer are not in dispute. At his deposition, Urban described the 2016 Forest River as follows:

> Q: Okay, help me out here, Mr. Urban. What is a 2016 Forest River?
>
> A: That is a 5th-wheel camper.
>
> Q: Can you describe that a little more? I'm not a camper.
>
> A: Yeah. It's just a camper that hooks inside the bed of the truck and you pull it that way instead of a travel trailer [that] hooks to a hitch on the bumper.
>
> Q: Okay. So then your truck, presumably the Ford F-350, pulls the Forest River to its destination?

---

[12] *See Dandurand v. CNA Ins.*, No. CIV. A. 97-4167, 1998 WL 175863, at *3 (E.D. Pa. Apr. 14, 1998) (explaining that under the Pennsylvania's Vehicle Code, a "military humvee" is a motor vehicle for purposes of the MVFRL); *Burdick v. Erie Ins. Grp.*, 946 A.2d 1106, 1109 (Pa. Super. 2008) (using the Pennsylvania Vehicle Code's definition of "motor vehicle" to determine whether an accident involving a dirt bike qualified for coverage); *see also Eberly v. Firemen's Ins. Co. of Washington, D.C.*, No. 5:20-CV-05471, 2021 WL 2935280, at *6 (E.D. Pa. July 13, 2021) (citing the Pennsylvania Vehicle Code's definition of a "fleet owner" to determine whether stacking was appropriate under the MVFRL).

A: Correct.

Q: Does the Forest River have a motor? Is it self-propelled
in any way?

A: No.

(Doc. 18-1, Def. Ex. C, Urban Dep. 12:4-19.) Urban's statements clearly explain that the 2016

Forest River was not "self-propelled" as required to be considered a "motor vehicle" under the

Pennsylvania Vehicle Code. In fact, in his response briefing, Urban admits that the 2016 Forest

River is "a camper that has no engine and is attached to a truck and towed." (Doc. 19-1 at 10.)

Instead of contesting the nature of the camper, he attempts to qualify it as a "motor vehicle" by

citing two cases in which the Pennsylvania Superior Court considered a non-motorized trailer as

*part of* a motor vehicle while being towed. *See Barnes v. Keller*, 62 A.3d 382 (Pa. Super. 2012);

*Callahan v. Federal Kemper Ins.*, 568 A.2d 264 (Pa. Super. 1989). As Allstate rightfully points

out, however, these cases addressed "whether an insured could recover non-stacked benefits

related to injuries sustained in connection with a trailer *while it was attached to a motor vehicle*."

(Doc. 18 at 28) (emphasis in original). We agree that these cases do not assist in our determination

of whether Urban's camper is a stand-alone "motor vehicle" for stacking purposes.[13]

Urban correctly references that his 2016 Forest River is listed with his other two vehicles,

a 2011 Ford Truck F-350 and 2013 Ford Taurus, under the general "Vehicles covered" section in

the Policy declarations. (Doc. 18-1, Def. Ex. A at 7.) The "Coverage detail" for each vehicle,

however, is instructive in our determination of whether those vehicles are eligible for UIM

---

[13] We think *Callahan* is particularly unhelpful to Urban's argument. In that case, the Pennsylvania
Superior Court stated that, "there is no question that an unattached trailer is not a motor vehicle."
568 A.2d at 266.

benefits. (*See id*. at 8-10.) The Policy declarations show that Urban carried UIM coverage with limits of $100,000.00 per person and $300,000.00 per accident for *only* the 2011 Ford Truck F-350 and the 2013 Ford Taurus—the "Coverage detail" listed below the 2016 Forest River does not include any mention of UIM benefits. (*See id*.) Therefore, we find no support in the Policy's language for stacking coverage in order to include the 2016 Forest River camper. Finally, Urban claims that because the trailer must be registered under the Pennsylvania Vehicle Code, it also must be considered a "motor vehicle" for stacking purposes. (Doc. 19-1 at 12); *see also* 75 PA. C.S. § 1920.1 (2019). We note, however, that whether a recreational trailer must be registered under the Pennsylvania Vehicle Code is a separate question from whether it is a "motor vehicle" for stacking purposes.[14]

Upon review of the record, we find that reasonable minds cannot differ on the fact that Urban's camper was not "self-propelled," which is required in order to qualify as a "motor vehicle" under Pennsylvania law. As a result, Urban cannot claim stacking of his UIM benefits for three (3) motor vehicles as a matter of law. For these reasons, summary judgment is granted as to this issue.

## V.   CONCLUSION

For the foregoing reasons, summary judgment is granted in part and denied in part. An appropriate Order follows.

---

[14] The term "motor vehicle" does not appear anywhere in 75 PA. C.S. § 1920.1 (the statutory section that Plaintiff cites in his brief). That statutory section requires registration of "Recreational trailers and recreational cargo trailers." *Id*.